**FILED**
**CLERK**

3:38 pm, Feb 27, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
PAUL JENSEN, individually and on behalf of
all others similarly situated,

                    Plaintiff,

          -against-

CABLEVISION SYSTEMS CORPORATION, a
Delaware Corporation; ALTICE N.V., and
DOES 1 through 100, inclusive,

                 Defendants.

--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:17-cv-100 (ADS)(AKT)

**APPEARANCES:**

**CARNEY BATES & PULLIAM, PLLC**
*Co-Counsel for the Plaintiff*
519 W. 7th Street
Little Rock, Arkansas 72201
     By:    Joseph H. Bates, Esq., Of Counsel

**THE CASEY LAW FIRM LLC**
*Co-Counsel for the Plaintiff*
20 NE Thompson Street
Portland, Oregon 97212
     By:    M. Ryan Casey, Esq., Of Counsel

**MILSTEIN, JACKSON, FAIRCHILD & WADE LLP**
*Co-Counsel for the Plaintiff*
10250 Constellation Blvd., 14th Floor
Los Angeles, California 90067
     By:    Gillian L. Wade, Esq.,
             Sara D. Avila, Esq., Of Counsel

**KU & MUSSMAN, P.A.**
*Co-Counsel for the Plaintiff*
6001 NW 153rd Street, Suite 100
Miami Lakes, Florida 33014
     By:    Brian T. Ku, Esq.,
             Louis I. Mussman, Esq., Of Counsel

**MAYER BROWN LLP**
*Attorneys for the Defendants*
1221 Avenue of the Americas
New York, New York 10020
      By:    Matthew D. Ingber, Esq., Of Counsel
1999 K Street, N.W.
Washington, DC 20006
      By:    Archis A. Parasharami, Esq., Of Counsel

**SPATT, District Judge**:

Paul Jensen ("Jensen" or the "Plaintiff") commenced this action individually and on behalf of others similarly situated against Cablevision Systems Corporation ("Cablevision"), and Altice N.V. ("Altice") (collectively the "Defendants") for damages stemming from alleged violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 and New York General Business Law ("GBL") § 349.  This case arises from allegations by the Plaintiff that the Defendants used the Plaintiff's wireless router, which was leased from the Defendants, to broadcast a public Wi-Fi network, without the Plaintiff's authorization.  In a Memorandum of Decision & Order, dated September 27, 2017 (the "Order"), the Court dismissed the Plaintiff's CFAA claim, leaving the state law claim as the only remaining cause of action.

The Defendants have moved to exclude the reports and testimony of Dr. Jennifer Golbeck and Dr. Mitchell Smooke.  In addition, the Plaintiff has moved for class certification, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule" or "FED. R. CIV. P.") requesting that the Court certify the class.

For the following reasons, the Defendants' motion to exclude the report and testimony of Dr. Mitchell Smooke is granted in part and denied in part and the Defendants' motion to exclude

the report and testimony of Dr. Jennifer Golbeck is granted in part and denied in part. The Plaintiff's motion for class certification is denied in its entirety.

## I. BACKGROUND

### A. The Factual Background

#### 1. The Parties

The Plaintiff is a resident of Brooklyn, New York and a subscriber to Cablevision's private Wi-Fi service, Optimum Online Wi-Fi ("Optimum Residential Wi-Fi"). Cablevision provided Jensen with a router free of charge in conjunction with his purchase of Optimum Residential Wi-Fi.

Cablevision is an American corporation, which is incorporated under the laws of the state of Delaware. Cablevision provides Optimum Residential Wi-Fi, along with other cable and internet services, to customers in New York, New Jersey, Connecticut and Pennsylvania and is registered with the New York Department of State. Its principal place of business is located at 1111 Stewart Avenue, Bethpage, New York 11714. In June 2016, Cablevision was acquired by Altice and has since done business in the United States as "Altice USA." Amended Class Action Complaint ("Compl.") ¶ 12.

Altice is a Dutch telecommunications company with an international footprint. Its principal place of business is in Amsterdam. Altice "provides and/or oversees" Optimum Residential Wi-Fi. *Id.* ¶ 13. Dexter Goei, the President of Altice, also now serves as the CEO of Cablevision.

#### 2. The Public Wi-Fi Network

In July 2013, the Defendants conceived of a public Wi-Fi hotspot network that utilized the Wi-Fi home networks of their customer base ("Optimum Public Wi-Fi"). Declaration of Gillian

3

L. Wade ("Class Cert. Wade Decl."), Feb. 9, 2018, Ex. 2 at 37:10-24. Originally, Cablevision considered providing customers with the opportunity to opt out of participating in Optimum Public Wi-Fi, which at the time was referred to as "Home as a Hotspot." Class Cert. Wade Decl., Ex. 2 at 31:5-16. The Defendants conducted market research, in part to determine customer opinion on this new network. This revealed that customers were concerned about control, security, internet speed and cost. Class Cert. Wade Decl., Ex. 4 at CV00034939. In pertinent part, the study explained:

> Subscribers often talked about control and how they want to maintain control over their connections. The fact that the router will be deployed to customers as an upgrade whether requested or not caused some to feel a loss of control, which is problematic.
>
> Security was a major concern. Despite being told that [the public network] operates on a completely separate network and that tech remote-in requires permission, subscribers often worried that their personal data would be compromised. Saying that this is not the case was enough for some, but others needed more convincing.
>
> Many worried that having guests on their network would mean decreased speeds.
>
> …
>
> There was a rather widespread assumption that the smart router would come at a price and/or would increase monthly charges – even after people read through information noting "no extra cost." This was concerning and another potential barrier to the adoption of the device.

*Id*.

When the service was launched, Cablevision altered its initial concept and revised its "Home as a Hotspot" name to "Optimum Wi-Fi." Class Cert. Wade Decl., Ex. 2 at 37:10-24. The program called for a modification of Cablevision's wireless routers, which were provided to customers free of charge. In addition to providing the Optimum Residential Wi-Fi network, Cablevision's routers were configured to broadcast the separate, publically accessible Optimum Public Wi-Fi. This network is only available to active Optimum subscribers. Declaration of

Matthew Ingber ("Ingber Decl."), Ex.10 at 35:18-24. Cablevision provides one of four models of wireless routers: Sagemcom 5260, Sagemcom 3965, D-Link DIR-868L and Netgear 3400. Each router became a component, along with other Cablevision wireless routers provided to other customers, of a large-scale, public Wi-Fi network. Compl. ¶¶ 16, 46. Optimum Public Wi-Fi is accessible to any active Optimum subscriber within range of the wireless router and is not password protected. Customers are not able to detect or monitor any of the individuals who utilize their wireless router to access Optimum Public Wi-Fi. However, customers may elect not to use the Cablevision-provided router and instead, purchase their own. Ingber Decl., Ex. 11 at 75:22-76:6. Allegedly, this large-scale, public network is part of a concerted effort by the Defendants to utilize their customer base to compete with cellular networks. Jensen claims that the Defendants are "externaliz[ing] much of the capital and operating costs" of such a network, in order to compensate for the lack of their own network infrastructure. Compl. ¶ 16.

### 3. Cablevision's Alleged Conduct

The Plaintiff contends that Cablevision altered its initial conduct based on the concerns noted in the customer opinion survey, including the assertion that public messaging avoided any reference to the integration of customers' home Wi-Fi network. Jensen points to an Optimum internet page that states "Optimum hotspots are a network of over 1.5 million super fast WiFi internet access points in locations including shopping centers, major streets, train platforms, parks, marinas, sports fields and more." Class Cert. Wade Decl., Ex. 2 at 89:15-90:17. Cablevision's 30(b)(6) deponent testified, in pertinent part:

> Q Okay. Is it fair to assume that Cablevision has engaged in advertising campaigns with regard to the Optimum Wi-Fi hotspot?
>
> A Yes.

Q Does Cablevision still, to this day, engage in campaigns with regard to the Optimum Wi-Fi network?

A We do.

Q Do any of these campaigns specifically mention the second SSID?

A Again, as I've stated previously, we don't talk about the second SSID. We talk about the benefit of it. So we talk about the Optimum Wi-Fi network, the one that exists for home and the one that exists when you're out and about within the proximity of a hotspot.

Q That's consistent across all of the campaigns?

MR. KIRSCHNER: Object to form.

Q They're talking about the benefit, not the SSID.

MR. KIRSCHNER: Object to form.

A Yeah.

…

Q I think you've already said this, but just to be sure, are you aware of any marketing material or collateral that Cablevision has provided to consumers that specifically mentions the second SSID?

A It's a very, very, broad, broad statement.

Q I understand.

A I do not know off the top of my head. It may be out there, so -- what I can say is of the materials we looked at today, it is something that was not in those materials.

Q Sitting here today, you can't specifically recall a material that discussed the second SSID?

MR. KIRSCHNER: Object to form.

A No.

Class Cert. Wade Decl., Ex. 5 at 153:2-24, 186:5-21.

The Plaintiff contends that prior to the launch, Cablevision decided to actively discourage any customers from being able to turn off the service by establishing a policy of instructing

customer service representatives to inform concerned customers that Optimum Public Wi-Fi could not be disabled under any circumstances. Further, the Defendants purportedly configured routers to prevent customer devices from seeing that their router was used for Optimum Public Wi-Fi.

Jensen argues that these decisions were devised by Cablevision's leadership. In a January 22, 2014 email, executive Kristin Dolan emailed then-CEO James Dolan stating:

> We want to be sure that we're violating your edict of not mentioning [Optimum Public Wi-Fi] in our collateral. These examples include language on friends and family accessing Optimum WiFi from home (which is tested and confirmed as a perceived benefit) but do not specifically talk about the [Optimum Public Wi-Fi] as being the mechanism by which this added value is achieved.
>
> I'd vote to keep this language in but we want to be sure we're not going against your direction on "no mention."

Class Cert. Wade Decl., Ex. 3. Customer routers account for over 80% of the hotspots in the Optimum Public Wi-Fi network. Class Cert. Wade Decl., Ex. 2 at 90:2-17.

### 4. Cablevision's Contracts

To purchase a service from Cablevision, customers must first enter into a contract as a condition for obtaining service. During the relevant time period, there were two ways that customers could sign the General Terms and Conditions of Service ("General Terms"). Some customers awere presented with a physical work order at the time of installation. *See* Compl. Ex. A. In that case, either the customer or their authorized representative signed the work order which contained a series of terms on the back of it. Other customers signed the General Terms using an iPad which was handed to them by the technician, also at the time of installation. The customer was required to check a box that stated "I agree" at every screen and sign their signature at the end of the document. While this document did not contain any reference to Optimum Public Wi-Fi, it did state:

> In addition to these General Terms and Conditions of Service, Subscriber agrees to be bound by the terms of service for the applicable Optimum service as set forth at www.optimum.net, such as Optimum TV, Optimum Online and Optimum Voice, as well as the Cablevision Customer Privacy Notice, as such may be updated from time to time (collectively, the "Terms of Service"), which are incorporated herein by this reference. In the event of any conflict between these Terms and Conditions below and the Terms of Service, the Terms of Service shall control.

Compl. ¶ 40 (internal citations omitted). Further, the General Terms contain an arbitration provision, which states:

> YOUR USE OF THE SERVICE IS SUBJECT TO A BINDING ARBITRATION PROVISION THAT AFFECTS YOUR RIGHTS UNDER THIS AGREEMENT WITH RESPECT TO ALL SERVICES. THIS PROVISION INCLUDES A WAIVER OF CLASS ACTIONS AND PROVISIONS FOR OPTING OUT OF ARBITRATION. A FULL COPY IS CONTAINED IN THE TERMS OF SERVICE, available at optimum.net/serviceinfo."

Compl., Ex. A.

The second pertinent agreement is the service terms which relate to residential Wi-Fi the Agreement for Optimum Online (the "Agreement"). The Agreement stated, "The Optimum Router is preconfigured to distribute a second wireless network (i.e. an Optimum WiFi Hotspot) in addition to the Home Network. This Optimum WiFi Hotspot is separate from the Home Network and is accessible by certain authorized Optimum WiFi users." *Id*. ¶ 43. The Defendants' 30(b)(6) witness testified that this language was the only reference to Optimum Public Wi-Fi in any customer agreement or terms of service. Class Cert. Wade Decl., Ex. 5 at 38:7-34. The Agreement was not provided to class members on the date of installation and was only found on the "Service Terms & Info" page on the Optimum website. *Id*. at 26:3-14. The Service Terms & Info page included a series of additional agreements for a variety of products. These agreements also included an arbitration clause. Declaration of Anne Cheung ¶ 2. The Defendants argue that it was incorporated by reference. Jensen contends that there wass no similar statement in any of the Defendants' marketing materials. Class Cert. Wade Decl., Ex. 5 at 153:2-24. Less than one

percent of customers have opted out of Cablevision's arbitration agreement. *See* Ingber Decl., Ex. 1 (listing all subscribers who opted out of Cablevision's arbitration clause as of January 1, 2016).

### 5. The Plaintiff's Experience

On June 5, 2015, Cablevision entered into a contract with the Plaintiff to provide Optimum Residential Wi-Fi for his residence. As part of that agreement, Cablevision provided the Plaintiff with a Netgear 3400 wireless router. The Plaintiff had the option to purchase his own wireless router, but chose instead to lease Cablevision's device. During the installation, Jensen received a work order with the General Terms on the back, and his brother signed it. Compl. Ex. A. He did not receive any additional materials at the time of the installation. Class Cert. Wade Decl., Ex. 12 at 194:8-19.

After a few days, Jensen noticed that there were two Wi-Fi networks broadcasting from his Cablevision-provided router. That day he contacted Cablevision to ask if the Optimum Public Wi-Fi feature could be disconnected. The Plaintiff was told that the service could not be turned off, and that he was free to purchase and use his own wireless router if he continued to harbor such concerns. During his conversation with customer service, Jensen demanded that Optimum Public Wi-Fi be disabled and when they refused to do so, ordered Cablevision to compensate him for what he viewed as an invasion of privacy and potential increased electricity costs. He also threatened Cablevision with a class action lawsuit to obtain compensation for his perceived damages. Class Cert. Wade Decl., Ex. 13 ("[I] will contact the attorneys that have sued comcast for this practice."). Soon after, the Plaintiff sent an email to Cablevision opting out of the purported arbitration provision. Class Cert. Wade Decl., Ex. 14 ("I Paul Jensen … therefore choose to opt out of the arbitration clause, and I choose to pursue this matter and any other disputes in court, not through arbitration, I do not waive any of my legal rights, and I am opting out of the arbitration

clause."). Following the installation, numerous unidentified parties connected to Optimum Public Wi-Fi using the Cablevision router provided to the Plaintiff. According to Jensen, he did not authorize Cablevision to use the wireless router to broadcast Optimum Public Wi-Fi.

Jensen claims that he has been forced to incur a higher electricity bill as a result of the Defendants' wireless router. He further alleges that his Optimum Residential Wi-Fi network has experienced decreased speeds and that the wireless router leased from the Defendants have been exposed to "possible, additional use by unknown third parties" without his knowledge or authorization. Compl. ¶ 51.

### 6. Dr. Mitchell Smooke

Dr. Mitchell Smooke is currently the Strathcona Professor of Mechanical Engineering at Yale University. He teaches classes in fluid mechanics, computational methods, applied mathematics and chemically reacting flows. He holds a joint appointment in the Department of Applied Physics. Previously, he was the Dean of Engineering, the Chairman and Director of Undergraduate Studies of Mechanical Engineering, and the Director of Graduate Studies for Engineering. Dr. Smooke also held a research position in the Department of Computer Science. Prior to joining the Yale faculty in 1984, he was a Staff Scientist at Sandia National Laboratories in Livermore, California. He is an active member of the Combustion Institute, the Institute of Physics, the American Institute of Aeronautics and Astronautics, the Society of Industrial and Applied Mathematics and the American Society of Mechanical Engineers. Since 1996, he has also been the Editor-In-Chief of *Combustion Theory and Modelling*. Dr. Smooke has authored more than 200 academic publications and given lectures at more than 50 conferences and symposiums.

Dr. Smooke was retained by the Plaintiff to run tests on a series of Optimum routers to measure their electricity consumption. To accomplish this, he used two versions of four different

model routers. For each model router, one version was only configured for a home network and another version was configured for both Optimum Residential Wi-Fi and Optimum Public Wi-Fi. For those routers only configured for a home network, Dr. Smooke connected the router to a SONY laptop and streamed a 50-minute episode of Star Trek. Power usage was monitored for 60 seconds every 10 minutes over a 50-minute period and the highest value during each 60-second period was recorded. The measurements were taken using a Kill A Watt EZ power monitor. Dr. Smooke then averaged the six measurements and a yearly kilowatt hour energy cost was computed using a cost of $0.25 per kilowatt hour.

For those routers that were Optimum Public Wi-Fi enabled, Dr. Smooke obtained power usage measurements under four separate conditions: (1) without any device connected to the router; (2) with a SONY laptop connected to Optimum Residential Wi-Fi and a 50 minute episode of Star Trek streaming; (3) with an ASUS laptop connected to the Optimum Public Wi-Fi network and a 50 minute episode of Star Trek streaming onto the laptop; and (4) with a SONY laptop connected to Optimum Residential Wi-Fi and the ASUS laptop connected to the Optimum Public Wi-Fi network and a 50 minute episode of Star Trek streaming onto both laptops. Power usage was monitored for 60 seconds every 10 minutes over a 50-minute period and the highest value during each 60-second period was recorded. The measurements were also taken using a Kill A Watt EZ power monitor. Dr. Smooke then averaged the six measurements and a yearly kilowatt hour energy cost was computed using a cost of $0.25 per kilowatt hour.

Based on this experiment, Dr. Smooke concluded that (1) there is an increase in yearly electrical costs when any of the routers stream data over Optimum Residential Wi-Fi compared to being idle; (2) there is an increase in yearly electrical costs of between 14.9% to 43.4% when data is streaming over the Optimum Public Wi-Fi network compared to being idle; (3) the electrical

costs are 9.6% to 25.4% higher when data is streaming on the Optimum Public Wi-Fi network compared to the Optimum Residential Wi-Fi network; and (4) the additional electrical costs when running data on both the Optimum Public Wi-Fi network and Optimum Residential Wi-Fi is 10.4% to 27.1% high compared to when data is streaming on the residential network.

### 7. Dr. Jennifer Golbeck

Dr. Jennifer Golbeck is an associate professor in the College of Information Studies at the University of Maryland. She was an assistant professor from 2007 until 2013, when she received tenure. While at the University of Maryland, Dr. Golbeck focuses her research and teaching on the internet as well as various aspects of social media. At her deposition, she testified that she also focuses her research on issues of trust, privacy, and network analysis. Dr. Golbeck recently authored two books on social media, entitled "Social Media Investigation" and "Analyzing the Social Web." She has taught the following classes at Maryland: "Analyzing Social Networks and Social Media," "Social Networks: Technology and Society," "Development of Internet Applications," "Fundamentals of Human-Computer Interaction," "Information Users in Social Context," and "Small Worlds, Social Networks, and Algorithms." Over 100 of her published papers or conference presentations relate to social media and the internet. Prior to joining the faculty of the University of Maryland, Dr. Golbeck taught at the University of Chicago, George Mason University, Johns Hopkins University, Georgetown University, George Washington University, and American University.

Dr. Golbeck was retained by the Plaintiff to provide an expert opinion on the following issues: (1) consumer expectations of privacy and autonomy, generally; (2) consumer expectations of privacy and autonomy, as they pertain to Internet Service Providers; and (3) the extent to which Cablevision's broadcasting of Optimum Public Wi-Fi from its subscribers' routers may or may not

undermine consumers' expectations of privacy and autonomy. Based on her analysis, she concluded: (1) consumers have expectations of privacy and autonomy regarding their home routers; and (2) Cablevision's practices with regard to broadcasting Optimum Public Wi-Fi from routers undermine consumers' expectations of privacy and autonomy.

To reach these conclusions, Dr. Golbeck reviewed a selection of case-related documents as well as recent studies on the subject. She also designed a methodology for determining whether an Internet Service Provider's use of routers for a public Wi-Fi hotspot intrude on customer's expectations of privacy and autonomy. She first identified four factors of privacy: trust, compensation, awareness and control and then explained that within the context of ISPs, consumers are concerned about access to their information, and access to or control over devices. "Concern over device control is slightly different [from other contexts], since it focuses on access to a service or device the user pays for, rather than information about the user."

Next, Dr. Golbeck compiled data and articles specifically pertaining to Internet Service Providers broadcasting public Wi-Fi hotspots using customer routers and examined relevant user comments. She then coded relevant comments regarding the practice using a series of labels. For example, she used "D" for "deceptiveness," "S" for "security issues," and "P" for "power usage." Approximately 81% of comments expressed a concern about the practice. The most common concerns were violations of consumer autonomy, quality of service, and trust in the cable company to fairly administer the program. This work was partially funded through a National Security Agency grant. In 2017, this study was presented at the Electronics and Mobile Communication Conference.

In addition to describing the methodology and results of this study, Dr. Golbeck's report discusses a series of documents in the case that were revealed during discovery. Dr. Golbeck uses them to examine Cablevision's activities and discuss the issues involved with these documents.

**8. Dr. Terrence McGarty**

The Defendants retained Dr. Terrence McGarty to review and evaluate the expert reports of Dr. Smooke and Dr. Golbeck. Dr. McGarty is currently Managing Partner and Founder of the Telmarc Group, a technology management and investment company. Prior to that, he was a Research Affiliate in the Department of Electrical Engineering and Computer Sciences at the Massachusetts Institute of Technology. In his 30 years of teaching, Dr. McGarty held faculty positions at the Massachusetts Institute of Technology, George Washington University, Polytechnic University, and Columbia University. Throughout his career, Dr. McGarty has had roles in operations and management for numerous telecommunications companies. According to his expert report, he has "considerable experience with the design and implementation of telecommunications networks, including IP data networks. [He] also has considerable experience with network management and operations. [He] is familiar with practices and procedures used to manage telecommunications network based on [his] experience at Warner Communications, where [he] served as Group President of Warner's Electronic Media Company; and NYNEX Mobile Communications Company … where [he] served as Chief Operating Officer; and at Telmarc, among others."

In his report, Dr. McGarity is highly critical of the opinions contained in the expert reports of Dr. Golbeck and Dr. Smooke.

**B. THE PROCEDURAL BACKGROUND**

On July 16, 2015 Jensen filed a putative nationwide class action lawsuit against Cablevision in this District. Although Cablevision filed a motion to dismiss, Jensen stipulated to the voluntary dismissal of every claim but his GBL § 349 claim. Judge Wexler subsequently dismissed the case *sua sponte* without prejudice for lack of subject-matter jurisdiction.

On January 6, 2017, the Plaintiff commenced this action by filing a class action complaint in this Court. The complaint set forth two causes of action: violations of the CFAA, 18 U.S.C. § 1030, and GBL § 349. For the first time, the Plaintiff included Altice in the complaint.

On January 12, 2017, the Plaintiff filed the Amended Class Action Complaint.

On March 27, 2017, the Defendants filed a motion to dismiss all of the Plaintiff's claims pursuant to Rule 12(b)(1), Rule 12(b)(2) and Rule 12(b)(6).

On July 6, 2017, the Defendants submitted a Notice of Supplemental Authority regarding the U.S. Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017). On July 14, 2017, the Plaintiff filed a response. The Court reviewed both letters.

On September 27, 2017, the Court issued the Order dismissing the Plaintiff's CFAA claim.

On February 9, 2018, the Plaintiff filed a motion to certify a New York-based class for his remaining cause of action. Specifically, Jensen seeks to represent a class of "[a]ll natural persons who have subscribed to Cablevision's Optimum Online Service in the State of New York and who, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot." In this motion, he relies on Dr. Smooke and Dr. Golbeck for his argument regarding class-wide injury.

On April 30, the Defendants filed motions seeking to exclude the report and testimony of Drs. Smooke and Golbeck.

## II. THE MOTIONS TO EXCLUDE

The Defendants seek to exclude the expert report and testimony of Dr. Mitchell Smooke on the basis that he is not qualified to render expert opinions in this case and that the opinions expressed in the expert report do not meet the standards for admissibility outlined in *Daubert* and its progeny. The Defendants also argue that this Court should exclude the expert report and testimony of Dr. Jennifer Golbeck because she lacks the qualifications to render expert opinions on this case and the opinions contained in her expert report do not meet the standards for admissibility outlined in *Daubert* and its progeny.

### A. STANDARD OF REVIEW

Prior to the Supreme Court's interpretation of FED. R. EVID. 702 in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the test to determine if scientific evidence was admissible at trial was whether the evidence was "generally accepted" as reliable within the relevant scientific community. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The *Frye* standard allowed novel scientific evidence to be admitted only if it was based on a generally accepted method or theory. *Frye*, 293 F. at 1014. *Daubert*, however, held that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence, which included a liberal relevance standard. FED. R. EVID. 401 states that evidence is relevant if it has any tendency to make the existence of any fact of consequence to the action more or less probable. FED. R. EVID. 401.

FED. R. EVID. 702, entitled "Testimony by Experts," states that: "[i]f … scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," "a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

FED. R. EVID. 702.  Examining FED. R. EVID. 702, *Daubert* provides a flexible analysis to guide

trial courts in determining whether proffered submissions of scientific evidence are admissible.

The Supreme Court emphasized the "flexibility" that should guide the trial court when making a

determination of the admissibility of scientific evidence and stressed that "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509

U.S. at 595 (internal citations omitted); *but cf. Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of

an otherwise reliable method will not render an expert's opinion per se inadmissible. 'The judge

should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for

his or her conclusions.'" (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir.

1994))).

> When faced with the prospect of expert testimony:
>
> the trial judge must determine at the outset, pursuant to [FED. R. EVID.] 104(a)
> whether the expert is proposing to testify to (1) scientific knowledge that (2) will
> assist the trier of fact to understand or determine a fact in issue. This entails a
> preliminary assessment of whether the reasoning or methodology underlying the
> testimony is scientifically valid and of whether that reasoning or methodology
> properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592-93 (internal citations omitted).  The Supreme Court provided a list of

factors for a trial court to consider when making this determination, but emphasized that "we do

not presume to set out a definitive checklist or test." *Id*. at 593.  The four factors include: (1)

whether the theory or technique can be or has been tested; (2) whether the theory or technique has

been subjected to peer review and publication; (3) the known or potential rate of error in the case

of a particular scientific technique; and (4) whether the theory or technique is generally accepted

within the relevant scientific community. *Id*.; *see generally Zuchowicz v. United States*, 140 F.3d

381 (2d Cir. 1998); *Iacobelli Constr., Inc. v. Cty. of Monroe*, 32 F.3d 19 (2d Cir. 1994). These factors are not considered exhaustive and the Supreme Court noted that other relevant factors may be reviewed. *Daubert*, 509 U.S. at 593.

Other factors include: (1) whether the proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); (2) whether the expert's field lacks reliability, *Id*. at 151; (3) whether the testimony comes from research conducted independent of litigation, *see Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995); (4) whether the proposed expert has considered additional explanations in his analysis, *see Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996); and (5) the "non-judicial uses to which the scientific technique are put." *United States v. Downing*, 753 F.2d 1224, 1239 (3d Cir. 1985).

While the four guidelines enunciated in *Daubert* "leave in place the 'gatekeeper' role of the trial judge in screening such evidence," *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997), the Second Circuit in *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) held that:

> [t]rial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*. [The Appellant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of the expert witness's soul—separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of evidence, the ageless role of the jury.

*Id*. at 1045.

In sum, the Federal Rules of Evidence, the Supreme Court's decision in *Daubert*, and the guidance of the Second Circuit require this Court, when making a decision as to whether to admit expert testimony to: (1) determine whether the witness is qualified to testify as an expert by

examining the witness's educational or experiential qualifications in the relevant field; and (2) using the non-exhaustive factors enunciated as guidelines, determine whether the proposed testimony will involve the relevant specialized knowledge that will assist the trier of fact to understand or to determine a fact in issue. While the focus of the Court's inquiry must remain on the methodology rather than the conclusions, the Court is not obligated to accept conclusions that do not flow from the facts and methodologies used. *Amorgianos*, 303 F.3d at 266 (internal citations omitted).

Following *Daubert*, it has become a well-accepted principle that FED. R. EVID. 702 is to be interpreted using a liberal standard of admissibility, which is a departure from the more restrictive *Frye* standards. *See Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). However, despite a more permissive approach to expert testimony, the Court must ensure that "any and all scientific (or other expert) testimony or evidence admitted is not only relevant but reliable." *Daubert*, 509 U.S. at 589.

Six years after *Daubert*, in *Kumho Tire Co.*, 526 U.S. at 152, the Supreme Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally "experience-based," FED. R. EVID. 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

Also, as stated above, the requirement of "reliability" is extremely important and requires a clear analytical connection between the expert's methodology and his conclusions. So that *Daubert* and FED. R. EVID. 702 "mandate the exclusion of ... unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. The Supreme Court assigned to the trial judge the task of ensuring

that an expert's testimony rests on a reliable foundation and is relevant to the issues in the case. The trial judge has latitude in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable.

Further, "[w]hen a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is 'limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'" *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 CIV. 8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (quoting *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009)). "The question is not, therefore, whether a jury at trial should be permitted to rely on [the expert]'s report to find facts as to liability, but rather whether [the court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (E.D.N.Y. 2000), *aff'd sub nom. In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001).

It is within this framework that the Court will exercise its gatekeeper role and address these motions by the Defendants to exclude the expert reports and testimony of Drs. Smooke and Golbeck.

## B. DR. SMOOKE

### 1. Qualifications

The Defendants first contention relates to Dr. Smooke's qualifications to express the opinions outlined in his expert report. Whether a particular witness qualifies as an expert is within the province of the trial judge. *See TC Sys., Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002). "In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Hilaire v. DeWalt*

*Indus. Tool Co.*, 54 F. Supp. 3d 223, 235-36 (E.D.N.Y. 2014) (internal citations omitted). Trial courts review the totality of an expert's qualifications in making this determination. *Argonaut Ins. Co. v. Samsung Heavy Indus. Co.*, 929 F. Supp. 2d 159, 168 (N.D.N.Y. 2013). A "broad range of knowledge, skills and training" are used to review an expert's general qualifications. *In re Paoli*, 35 F.3d at 741. "An expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" *Hilaire*, 54 F. Supp. 3d at 236 (quoting *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006)).

The Defendants contend that Dr. Smooke is unqualified to opine as an expert in electrical consumption because he lacks the relevant subject-matter training or experience. Dr. Smooke is a mechanical engineer and has no recent education or experience in electrical engineering. However, "a witness' lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony." *Id*.

The Defendants cite *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247 (S.D.N.Y. 1997) for the proposition that a mechanical engineer may not opine on matters of electrical engineering. In *Trumps*, the putative expert was a mechanical engineer with only limited involvement of issues in electrical engineering. Judge Haight noted that he belonged to no electrical engineering professional organizations; published no articles in the field; held no related patents; and was unable to identify any authoritative sources related to electrical engineering. *Trumps*, 969 F. Supp. at 252. Further, at his deposition, the proposed expert could not explain a series of concepts relevant to the field. *Id*. However, unlike this case, the expert-at-issue sought to testify as to the product's design. Dr. Smooke is not testifying as to any potential defects of the routers or the

causation behind any increase in electrical consumption. He is merely testifying as to the results and analysis of his electrical consumption test.

In this and other cases, district courts in this circuit have found experts unqualified when they did not have direct experience with the particular product or field pertinent to the litigation. *See Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 132 (E.D.N.Y. 2009) (precluding an expert who "never provided testimony, conducted studies, authored articles, or performed any other consulting work, specific to ladder design or accidents"); *Quintanilla v. Komori Am. Corp.*, No. 04 CV 5227, 2007 WL 1309539, at *4 (E.D.N.Y. May 4, 2007) (precluding an expert who had no experience with the products at issue, even though he had experience in the mechanical design in related products). Notwithstanding these cases, other courts have ruled that an expert is not unqualified to proffer an opinion solely because of his or her lack of relevant experience in a specific field or with a particular product. *See, e.g.*, *Peretz v. Home Depot Inc.*, No. 08-CV-4106, 2009 WL 3124760, at *2-3 (E.D.N.Y. Sept. 29, 2009); *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 176 (E.D.N.Y. 2008).

In the instant case, the Court is persuaded by the latter line of cases. At this stage of its *Daubert* analysis, the Court must evaluate the totality of Dr. Smooke's qualifications to determine whether his knowledge of the subject matter involved "will likely assist the trier of fact in arriving at the truth." *Hilaire*, 54 F. Supp. 3d at 235-36. While Dr. Smooke is admittedly not an electrical engineer and cannot be considered an expert in electrical engineering matters, the scope of his testimony is limited to his analysis of the electrical consumption test he used. Dr. Smooke has extensive and notable training and experience in various fields of engineering. Given his engineering education, training and experience, he is certainly qualified to testify regarding an electrical consumption test. As a highly educated and experienced engineer, he is qualified to

render an opinion on the electrical consumption of routers. Any issue raised by the Defendants "goes to the weight of his testimony," *Id.*, rather than the admissibility of that testimony. *See, e.g.*, *McCullock*, 61 F.3d at 1043 (ruling that the movant's argument regarding the purported expert witness' "academic training … and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility").

The Court rules that Dr. Smooke is qualified to offer his expert report at the class certification stage.

### 2. Reliability & Helpfulness

The Defendants further argue that Dr. Smooke's expert report should be excluded because the methodology used in his electrical consumption test is unreliable. Cablevision makes five criticisms of Dr. Smooke's methodology: (1) the power meter used in the experiment is unreliable; (2) the study is not reflective of real-world customers; (3) the experiment was conducted in Dr. Smooke's residence rather than a controlled laboratory environment; (4) the readings were manually recorded by Dr. Smooke; and (5) Dr. Smooke used the highest energy usage for each 60-second period.

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *In re Paoli*, 35 F.3d at 746.

The Defendants' second critique of the experiment is that the test is not reflective of the actual experience of any of Calbevision's customers because he assumed that users would be streaming data at all times. This argument, that the testing was not conducted under normal operating conditions goes to the weight of Dr. Smooke's opinion rather than its admissibility. *See Amorgianos*, 303 F.3d at 267. The Court agrees that these test results do not account for realistic electricity consumption by Cablevision customers throughout the course of the year. There are a series of variables that impact a customer's energy usage including the number of people using it, the strength of signal, building type, and location of the router. Yet, the limits in the potential applications of Dr. Smooke's data do not render the entire report inadmissible.

However, the Defendants' first, third, fourth and fifth reasons all counsel against the reliability of the study.

First, the power meter used in the study, the Kill A Watt device, does not have the accuracy required to calculate incremental energy consumption. The Defendants' expert, Dr. McGarty conducted a laboratory test to measure the accuracy of the device and found that it failed to meet the manufacturer's stated 2% maximum error rate in 17 out of 18 testing scenarios. The Plaintiff fails to rebut this contention. While Dr. Smooke did test the accuracy of the Kill A Watt, he merely measured the voltage of a power outlet at home with both the Kill A Watt and another voltage meter. Further, the Plaintiff argues that a deviation from the stated accuracy specifications is irrelevant when comparing the electrical consumption of routers. Yet, unreliable measurements can have a significant impact on a comparative study where the difference between measurements of a given router may be less than 5%. Dr. McGarty's study revealed an average error rate of between 2.47% and 4.29%.

This issue is potentially compounded by the Defendants' fourth argument, that Dr. Smooke manually observed and recorded the power readings. Throughout the entire study, Dr. Smooke recorded approximately 8,000 numbers. With the introduction of the volume of manual data entries, which were recorded on a second-by-second basis, this strongly suggests that Dr. Smooke's experiment potentially suffers from a significant rate of error.

The Defendants' third challenge to Dr. Smooke's test is that he conducted it in his own home rather than a controlled laboratory environment. As explained above, in a *Daubert* analysis, courts frequently consider whether an expert has accounted adequately for potential alternative explanations. By failing to conduct this study in a controlled environment, the Court is unable to evaluate whether alternative explanations are plausible. One obvious explanation for the higher electricity consumption is that other users may have been connected to the routers, increasing the meter readings. Without conducting the test in a controlled environment, it is impossible to rule out obvious alternative explanations for the study's results.

Finally, the Defendants challenge Dr. Smooke's use of the highest value of energy usage recorded in each 60-second period. Using only the highest value gives a distorted picture of the power consumed during the entire 60-second period. It is entirely possible that the average electricity was not higher when using the average rather than the highest value. The Defendants contend that it is entirely possible that this practice does not just overestimate energy usage but yields different outcomes. The Plaintiff does not address this possibility in their briefing and the Court recognizes the potential for such a result.

After evaluating Dr. Smooke's expert report, the Court finds that he fails to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Accordingly, the Court finds that Dr. Smooke's expert report does not assist the trier of fact in determining whether a class-wide injury existed in the class certification context. As such, the Court excludes Dr. Smooke's expert report from consideration during its evaluation of the Plaintiff's motion for class certification.

## C. DR. GOLBECK

### 1. Qualifications

The Defendants argue that Dr. Golbeck is unqualified to proffer expert testimony in this matter because her background is in social media and the internet rather than "WiFi privacy issues, routers, or Internet service providers." As stated *supra*, "an expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" *Hilaire*, 54 F. Supp. 3d at 236 (quoting *Yaccarino*, 2006 WL 5230033, at *9). This attempt by the Defendants to narrowly define the granularity of expertise required to qualify as an expert is not supported by the liberal relevance standard of FED. R. EVID. 702. *See Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 73-74 (N.D.N.Y. 2013).

Dr. Golbeck's expertise centers around the public's interactions with the Internet, including privacy implications. She runs the Social Intelligence Lab at the University of Maryland, which focuses on interactions with the internet, including how they impact privacy, autonomy, security and artificial intelligence applications. She also testified in her deposition that she focuses her research on "social media; issues of trust; privacy; [and] network analysis." Declaration of Gillian L. Wade ("*Daubert* Wade Decl."), May 14, 2018, Ex. 4 at 20:23-24. This includes a focus on "usable security, essentially making security and privacy systems clearer for people to use and

make it easier for them to express their preferences about privacy and security issues." *Id*. at 18:9-14.

The issues raised by the Defendants regarding the focus of Dr. Golbeck's research "go[] to the weight of [her] testimony," *Id*., rather than the admissibility of that testimony. *See, e.g.*, *Benton v. Brookfield Props., Corp.*, No. 02 Civ. 6862, 2004 WL 2404184, at *1 (S.D.N.Y. Oct. 27, 2004) (ruling that "any attack on [the expert's] credentials … goes to the weight of his testimony, not its admissibility").

The Court rules that Dr. Golbeck is qualified to offer her expert report at the class certification stage.

### 2. Reliability & Helpfulness

The Defendants further argue that Dr. Golbeck's expert report should be excluded because (1) her opinions are not based on reliable methods; and (2) she remarks on legal issues, motive, intent and state of mind.

The Court will first address Dr. Golbeck's purported commentary regarding record evidence. In order for expert testimony to be helpful to the fact-finder, it must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Although an expert "may opine on an issue of fact within the jury's province," she may not "give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). If expert testimony addresses "lay matters which a jury is capable of understanding and deciding without the expert's help," it is inadmissible. *Andres v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

Sections IV.b and IV.c of her report are admittedly based on the Plaintiff's evidence concerning Cablevision's internal decisions. *See Daubert* Wade Decl., Ex. 2 ¶¶ 30-57. The only sources cited are internal Cablevision documents and the deposition transcripts of Timothy Farrell and Matthew Lake. *Id*. These documents, and Dr. Golbeck's interpretations of them concern internal Cablevision knowledge, decisions, public pronouncements and service terms all regarding the Optimum Public Wi-Fi network.

While it is within an expert's purview to rely on facts or data from the record to formulate his or her opinion, *see* FED. R. EVID. 703, an expert may not use his or her report to construct a factual narrative based upon record evidence. *See, e.g.*, *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (ruling that portions of an expert report were inadmissible because the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing").

Dr. Golbeck's expert report includes an improper rehashing of otherwise admissible evidence. Interpreting admissible evidence without having personal knowledge or experience is improper. Beginning in Section IV.b, she goes into painstaking detail surrounding the results of Cablevision's market research and what internal company presentations revealed on the company's knowledge of privacy concerns. She continues to testify as to her interpretation of internal documents that show, in her opinion, that "the company worked to prevent customers from even knowing that their routers were being used to provide public internet access." *Daubert* Wade Decl., Ex. 2 ¶ 36. She opines that "Cablevision makes it extremely difficult for customers to find its lone reference to the residential hotspots, which is found in an ancillary page on its website," *Id*. ¶ 37, and that this reference is the only mention of it "in any of Cablevision's disclosures, webpage documents or marketing materials, *per the company's express intent*." *Id*. ¶ 38 (emphasis

added). Section IV.b also contains deposition testimony from Timothy Farrell, which Dr. Golbeck concludes "demonstrates a dissonance between the representation made by Cablevision as to a particular benefit of its Smart Router … and the intentional *omission* of information that Cablevision has incorporated into its router's functionality." *Id.* ¶ 41 (emphasis in original). After reviewing company documents, Dr. Golbeck hypothesizes that "[t]he decision to hide the existence of residential hotspot[s] was a decision passed down from the highest levels of the company." *Id.* ¶ 49.

Section IV.c gave readers a "view into Cablevision's strategy" to determine that "the company *consciously chose* to eliminate consumer choice from the process." *Id.* ¶ 53 (emphasis added). Dr. Golbeck analyzes a collection of company emails to explain that the process by which a customer can turn off the Optimum Public Wi-Fi hotspot "involved Cablevision making *intentionally inaccurate representations* to [customers]." *Id.* ¶ 55 (emphasis added).

These sections of the report include speculation regarding the meaning of certain internal documents as well as conjecture as to the company's intentions. Dr. Golbeck is simply repeating otherwise admissible evidence. She has no personal knowledge regarding any of this information and it is only presented to the fact-finder for the purpose of repeating the Plaintiff's factual narrative.

Accordingly, the Court excludes paragraphs 30 to 57 in Dr. Golbeck's expert report from consideration during its evaluation of the Plaintiff's motion for class certification.

The Defendants further contend that the methodology Dr. Golbeck used in reaching her opinions in this case was unsound. Specifically, they take issue with (1) her use of "anecdotal Internet article and the comments posted on those articles[;]" and (2) the sources used are not specific to Cablevision customers. Yet, these challenges have not demonstrated that Dr. Golbeck's

methodology was so flawed so as to make her analysis fundamentally unreliable. *See Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333 (E.D.N.Y. 2002) ("Disputes about … faults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion 'go to the weight, not the admissibility of his testimony.'" (quoting *McCullock*, 61 F.3d at 1044)). The Court has no reason to believe that Dr. Golbeck was relying on "junk science" in reaching her conclusions, such that the Court should preclude such information from reaching the jury.

Therefore, the Defendants' motion to preclude Dr. Golbeck's report is denied.

As stated *supra*, paragraphs 30 to 57 are stricken from the expert report.

## III. THE MOTION FOR CLASS CERTIFICATION

The Plaintiff seeks to represent a class of "[a]ll natural persons who have subscribed to Cablevision's Optimum Online Service in the State of New York and who, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot."

### A. STANDARD OF REVIEW

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a)." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). Rule 23(a) requires the Plaintiff to meet the following requirements: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the classes ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). FED. R. CIV. P. 23(a).

After establishing Rule 23(a)'s four preconditions, the claims must also satisfy one of the scenarios in Rule 23(b)(1)-(3). FED. R. CIV. P. 23(b). In the instant case, the Plaintiff seeks to

certify a class under Rule 23(b)(3) and in the alternative Rule 23(b)(2). Rule 23(b)(3) requires that (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members," also referred to as the "predominance" requirement; (ii) and "the class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy," also known as the "superiority" requirement.

Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Actions for injunctive relief will satisfy the requirements of Rule 23(b)(2) if the injunctive relief sought will benefit the entire class. *See Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001). "[W]hen making an ad hoc determination, a district court 'should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.'" *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 20 (2d Cir. 2003) (quoting *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 164 (2d Cir. 2001) *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)). Rule 23(b)(2) "was never intended to cover cases ... where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir. 1968); *Goldberg v. Winston & Morrone, P.C.*, No. 95 Civ. 9282, 1997 WL 139526, at *4 (S.D.N.Y. Mar. 26, 1997).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (internal citations omitted); *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 74 (E.D.N.Y. 2015) (Spatt, J.). *See also Teamsters Local 445 Freight Div. Pension Fund*, 546 F.3d at 202 ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements.").

In that regard, a district court may only certify a class action if it concludes after a "rigorous analysis" that the proposed class meets the requirements of Rule 23(a) and (b). *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) ("A class may be certified only if, 'after a rigorous analysis,' the district court is satisfied that the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met.") (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013))). Such an analysis will often "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351; *accord Teamsters Local 445 Freight Div. Pension*, 546 F.3d at 202 ("'[T]he obligation to make such [factual] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.'" (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006))). Although such a decision is to be made as early as practicable, FED. R. CIV. P. 23(c)(1)(A), "this does not mandate precipitous action." *Chateau de Ville Prods., Inc. v. Trans-Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978).

**B. RULE 23(A)**

As noted above, Jensen must establish, by a preponderance of the evidence, that the proposed class meets each of the four Rule 23(a) requirements—numerosity, commonality, typicality, and adequacy of representation. The Court will address each requirement, in turn.

### 1. Numerosity

Rule 23(a)(1) requires the movant to show that "the class is so numerous that joinder of all class members is impracticable." "[N]umerosity is presumed where a putative class has forty or more members." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

The Plaintiff asserts that the proposed class consists of at least 928,974 New Yorkers who purchased Optimum Residential Wi-Fi during the relevant class period and received a free, Optimum Public Wi-Fi enabled router. *See* Plaintiff's Motion for Class Certification, Dkt. 56, at13-14. The Defendants do not dispute Jensen's contention in their opposition papers. *See* Defendants' Opposition to Plaintiff's Motion for Class Certification, Dkt. 64. Even a class of exclusively those New York customers who opted out of the arbitration provision and class action waiver is more than 150 potential members.

Accordingly, the Court finds that the Plaintiff has satisfied Rule 23(a)'s numerosity requirement. *See Consolidated Rail Corp.*, 47 F.3d at 482 ("[N]umerosity is presumed at a level of 40 members." (citing 1 *Newberg on Class Actions 2d*, (1985 Ed.) § 3.05)).

### 2. Commonality

In *Dukes*, the Supreme Court ruled that to show commonality, it is not enough for the movant to allege that the proposed class members share common questions. Rather,

> [w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id*. (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015) ("The Supreme Court has recently clarified the commonality requirement under Rule 23(a). 'Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law.'" (quoting *Dukes*, 564 U.S. at 349-50)). However, the more disputes pertain to individual conduct or circumstances, the more likely that individualized inquiries will be required to provide a resolution.

The Plaintiff asserts that the commonality requirement is satisfied because there are multiple common issues of law and fact central to the Plaintiff's sole remaining claim, GBL § 349. Specifically, Jensen asserts the following common issues: (1) whether the work order provided to customers obtains authorization for the Defendants to use wireless routers to create the Optimum Public Wi-Fi network; (2) whether the Agreement is incorporated by reference into the General Terms; and (3) whether Cablevision's conduct violated GBL § 349. The Defendants contend that Jensen has failed to prove class-wide injury and class-wide causation.

The Court finds that commonality is satisfied because there are several questions of law and fact that are common to the proposed class. As the Plaintiff correctly notes regarding commonality, "[e]ven a single [common] question will do." *Dukes*, 564 U.S. at 359 (internal citations and quotation marks omitted). These questions include, but are not limited to whether the Agreement is incorporated by reference into the General Terms; whether the proposed class

34

members authorized the Defendants to broadcast the Optimum Public Wi-Fi network using routers provided to them by Cablevision free of charge; and whether Cablevision's practices were misleading in a material respect.

Section 349 prohibits deceptive practices in the conduct of any business, trade or commerce or in providing any service in New York State. GBL § 349(a). The Plaintiff must show: "(1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (internal citations and quotation marks omitted). "The New York Court of Appeals has established an objective standard for determining whether acts or practices are materially deceptive or misleading 'to a reasonable consumer acting reasonably under the circumstances.'" *Id*. (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)).

The Plaintiff has presented a series of questions that address issues that go to the heart of his class-wide claims. Most notably, the answer to whether the sole reference to the Optimum Public Wi-Fi in the Agreement, the instructions to customer service representatives and the public-facing material were materially false or misleading. *See Hughes v. The Ester C Co.*, 317 F.R.D. 333, 345 (E.D.N.Y. 2016), *reconsideration denied sub nom. Hughes v. Ester C. Co.*, 320 F.R.D. 337 (E.D.N.Y. 2017); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015).

The Defendants raise legitimate concerns regarding the Plaintiff's ability to prove, by a preponderance of the evidence, class-wide injury or causation. However, unlike the Court's inquiry into Rule 23(b)(2)'s predominance requirement, satisfying commonality is a much less exacting standard. District courts in the Second Circuit have repeatedly found that "where the

consumer protection statute at issue supplies an objective test, such claims are considered 'ideal for class certification' because they allow the court to adopt classwide presumptions of reliance and do not require an investigation into class members' individual interaction[s]...." *Kurtz v. Kimberly-Clerk Corp.*, 321 F.R.D. 482, 530 (E.D.N.Y. 2017) (citing *Ackerman v. Coca-Cola Co.*, No. 09 CV 395, 2013 WL 7044866, at \*10 (E.D.N.Y. July 18, 2013)).

Further, it is well-established that "the need for an individualized determination of damages suffered by each class member generally does not defeat the [commonality] requirement." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 199 (S.D.N.Y. 2011) (quoting *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 448 (S.D.N.Y. 2010)); *see also Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014) ("[I]t is axiomatic that '[t]he commonality requirement may be met when individual circumstances of class members differ,' as long as class members' 'injuries derive from a unitary course of conduct.'" (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 127 (S.D.N.Y. 2011))); *Poplawski v. Metroplez on the Atl., LLC*, No. 11-cv-3765, 2012 WL 1107711, at \*8 (E.D.N.Y. Apr. 2, 2012) ("While damages owed to each employee will require individual determinations, this computation issue does not destroy commonality."). As a court in this district noted, "despite differing 'individual circumstances of class members,' commonality exists where 'injuries derive from a unity course of conduct by a single system.'" *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. 2015) (quoting *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014)).

The Defendants arguments will be more appropriately addressed in the Court's predominance analysis. Yet, the existence of at least one material question that arises under the pertinent statute that is common to members of the putative class is sufficient at this stage. Accordingly, the Court finds that the Plaintiff has satisfied Rule 23(a)'s commonality requirement.

### 3. Typicality

Typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality. *Id.* at 937. However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, ─── U.S. ───, 137 S. Ct. 1702, 198 L. Ed. 2d 132 (2017)).

The *Dukes* Court emphasized that in "in certain 'context[s] ... '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Sykes*, 780 F.3d at 80 (quoting *Dukes*, 564 U.S. at 349 n. 5) (alterations in original). The requirement is satisfied when the named plaintiff's claim arises from the same course of events and makes similar legal arguments as the rest of the proposed class.

The Plaintiff asserts that the proposed class meets the typicality requirement because Jensen's claims and the proposed class members' claims arise from the same course of conduct, namely Cablevision's use of its customers to broadcast the Optimum Public Wi-Fi network without the consent of those customers.

The Defendants state that typicality is not satisfied because (1) the absent class is subject to unique defenses because Jensen opted out of the arbitration provision; (2) his awareness of the provision in the Agreement that he now claims was not adequately disclosed; (3) his use of the Optimum Public Wi-Fi network; and (4) his purportedly false statements about his past litigation history.

The crux of the Defendants' arbitration argument is that a named plaintiff who opted-out of an arbitration agreement cannot represent absent class members who are potentially subject to an arbitration agreement. "In assessing the typicality of the plaintiff's claims, the court must pay special attention to unique defenses that are not shared by class representatives and members of the class." *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003). "This rule applies to defenses that negate the plaintiff's case-in-chief and to affirmative defenses for which defendant bears the burden of proof." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 308 (S.D.N.Y. 2004).

As noted above, Jensen is one of approximately one percent of customers to opt out of the arbitration and class action waiver provisions. The remaining 99 percent of customers are potentially subject to Cablevision's waivers as set forth in the Agreement. As of January 1, 2016, less than 200 New York-based customers had opted out of the arbitration provision.

Those customers who signed arbitration provisions are potentially subject to possible defenses that are inapplicable to Jensen. While the vast majority of customers might be subject to arbitration and class-action waiver, there are no circumstances by which these provisions are applicable to the Plaintiff. The Court could not locate, and the parties did not identify, any case in this Circuit where the issue of arbitration waiver by purported class members was addressed in the context of a typicality argument in a Rule 23 class certification motion. While there are numerous

cases where district courts elected to conditionally certify a class before ruling on the enforceability of arbitration provisions, these cases were not decided using a Rule 23 analysis and exclusively involved opt-in classes. *See, e.g.*, *Castillo v. Perfume Worldwide Inc.*, No. 17-CV-2972, 2018 WL 1581975, at *12 (E.D.N.Y. Mar. 30, 2018) ("Whether an opt-in is precluded from pursuing his or her claim by virtue of their signing an arbitration agreement is premature at this stage); *Hernandez v. Immortal Rise, Inc.*, No. 11-CV-4360, 2012 WL 6720734, at *2 (E.D.N.Y. Dec. 27, 2012) ("[D]efendants argue that the proposed class should be limited to …those who had not signed arbitration agreements[.] However, [that is an] issue[] of fact that should be determined during discovery rather than at this preliminary stage."); *D'Antuono v. C & G of Groton, Inc.*, No. 3:11-cv-33, 2011 WL 5878045, at *2 (D. Conn. Nov. 23, 2011) (collecting cases).

The Court finds *Tan v. Grubhub, Inc.*, No. 15-cv-05128, 2016 WL 4721439 (N.D. Cal. July 19, 2016) instructive. *Tan* involved a putative class action of delivery drivers who were purportedly misclassified as independent contractors and denied the benefits of California wage-and-hour laws. *Id.* at *1. Grubhub's Delivery Service Provider Agreements contained opt-out provisions that allowed drivers to opt out of an arbitration provision. Lawson, one of two named plaintiffs, entered into two Delivery Service Provider Agreements and opted out of the arbitration and class action waiver agreements of both agreements. Only one other driver in California opted out of the arbitration and class action waiver provisions. The district court found that Lawson could not satisfy either the typicality or adequacy requirements of Rule 23 because his claims are atypical of the putative class members who were subject to the arbitration and class action waiver provisions. *Id.* at *3 (citing *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015); *Tschudy v. J.C. Penney Corp., Inc.*, No. 11-CV-1011, 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015); *Quinlan v. Macy's Corp. Servs., Inc.*, No. 12-20737, 2013 WL 11091572, at *3

(C.D. Cal. Aug. 22, 2013); *King v. Capital One Bank (USA), N.A.*, No. 3:11-CV-68, 2012 WL 5570624, at *14 (W.D. Va. Nov. 15, 2012); *Renton v. Kaiser Found. Health Plan, Inc.*, No. C00-5370, 2001 WL 1218773, at *7 (W.D. Wash. Sept. 24, 2001)).

Quoting the Ninth Circuit, the district court found that "those who signed [arbitration and class-action waivers] have potential defenses that [the named plaintiff] would be unable to argue on their behalf." *Id*. (citing *Avilez*, 596 F. App'x at 579). Accordingly, the named plaintiff's claim lacked typicality. Both *Tan* and the instant case involve a named Plaintiff that opted out of an arbitration agreement seeking to represent a putative class of almost entirely individuals who were potentially subject to such an agreement. The Court finds the reasoning of Judge Corley persuasive. The mere potential that the relevant arbitration provision is valid is sufficient to preclude a named plaintiff who opted out of the provision from representing a class largely made up of individuals that may be subject to the agreement.

The Plaintiff argues that the arbitration provision is not incorporated by reference into the General Terms and therefore, no putative class member is subject to its terms. The Defendants have not moved to compel arbitration and the enforceability of the arbitration provision is not before this court. At class certification, the question for this Court to decide is not the validity of the agreement but whether the presence of class members that are potentially subject to the provision satisfies the requirements of Rule 23. This Court will not compel absent putative class members who are not before this Court to binding arbitration or issue a ruling regarding the enforceability of the provision. Any such ruling is procedurally improper and analogous to an advisory opinion. *See Whittington v. Taco Bell of America, Inc.*, No. 10-CV-01884, 2011 WL 1772401, at *7 (D. Colo. May 10, 2011) ("[T]he court agrees that the existence of a valid arbitration agreement could affect Plaintiff's ability to satisfy … Rule 23(a). However, the court

concludes that it cannot compel putative class members who are not before the court to binding arbitration or issue a declaratory judgment regarding the enforceability of the alleged arbitration agreement at issue. Such a declaration would constitute an advisory opinion at this time.").

The Plaintiff also contends that this Court has already ruled that "[t]he Defendants' argument that the Agreement … is incorporated by reference does not satisfy the first prong of the test under New York law." Order at 23. This selective citation to the Order misses the point. The Court held that at the motion to dismiss stage, where all facts in the complaint are taken as true and all ambiguities are resolved in favor of the plaintiff, it could not be said that the Agreement was identified by the General Terms beyond all reasonable doubt. *Id.* At that early stage in the litigation, it was a disputed issue of fact not properly resolved on a motion to dismiss.

In sum, the existence of an arbitration provision that potentially involves over 99 percent of the proposed class impacts the typicality of the Plaintiff's claim. Further, as the Court has already determined that the claims or defenses of Jensen are atypical of the claims or defenses of the proposed class, the Court declines to rule on the remainder of the Defendants' arguments.

Accordingly, the Court finds that the Plaintiff has not satisfied Rule 23(a)'s typicality requirement.

### 4. Adequacy of Representation

"Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60. There is "no simple test for determining if a class will be adequately represented by a named plaintiff." *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986). "Each case must be approached on an individual basis." *Id.* The Court should consider "the representative's understanding and

involvement in the lawsuit," "the willingness to pursue the litigation," and "any conflict between the representative and the class." *Id.* (citing *Eisen*, 391 F.2d at 562-63).

In *Dukes*, the Supreme Court suggested that the inquiry into whether the named plaintiff's interest are antagonistic to the interests of other class members also tends to merge with the requirements of commonality and typicality. *See Dukes*, 564 U.S. at 349 n. 5 ("[Typicality and commonality] ... also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.'" (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982))).

The Plaintiff asserts that he would be an adequate representative because (1) Plaintiff's claims are aligned with those of putative class members; and (2) Plaintiff's counsel has significant experience in litigating class actions. The Defendants contend that Jensen is an inadequate representative for the same reasons alleged in their typicality argument, namely because (1) the absent class is subject to unique defenses because Jensen opted out of the arbitration provision; (2) his awareness of the provision in the Agreement that he now claims was not adequately disclosed; (3) his use of the Optimum Public Wi-Fi network; and (4) his purportedly false statements about his past litigation history.

The analysis required for Rule 23(a)(4)'s adequacy requirement is analogous to that required for typicality: the class representative must "fairly and adequately protect the interest of the class." Fᴇᴅ. R. Cɪᴠ. P. 23(a)(4); *Falcon*, 457 U.S. at 157 n.13. In the instant case, the Defendants' argument that opting out of the arbitration provision subjected the absent class to unique defenses encompasses both typicality and adequacy. *See Gary Plastic Packaging*, 903 F.2d at 180 ("Regardless of whether the issue is framed in terms of the typicality of the representative's

claims … or the adequacy of its representation … there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."); *Rocco v. Nam Tai Elec., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("Just as [the plaintiff] is subject to unique defenses questioning his typicality, this Court also finds him prone to the following unique defenses that jeopardize his adequacy.").

For the reasons set forth *supra*, in Section III.B.3, the interests of the absent class members do not coincide with Jensen's interests because the vast majority of the potential class is subject to unique defenses which go to the heart of the litigation. Because the Plaintiff cannot adequately represent the interests of those putative class members who are potentially bound by the arbitration and class action waiver provisions, the Plaintiff is not an adequate representative of the class. *See Tan*, 2016 WL 4721439, at *3. As the Court has already determined that Jensen is an inadequate representative of the proposed class, the Court declines to rule on the remainder of the Defendants' arguments.

Accordingly, the Court finds that the Plaintiff has not satisfied Rule 23(a)'s adequacy requirement.

## C. RULE 23(B)(3)

Assuming *arguendo*, that the Plaintiff satisfies Rule 23(a), Jensen is unable to certify a class under Rule 23(b)(3). As noted above, to certify a class using Rule 23(b)(3), the Plaintiff must establish, by a preponderance of the evidence, that the proposed class meets two requirements—predominance and superiority. The Court will address each requirement, in turn.

### 1. Predominance

"The predominance requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through

generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).

"Like the commonality inquiry, a court examining predominance must assess (1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Joseph M. McLaughlin, McLaughlin on Class Actions* § 5:23 (11th ed. 2014)). However, "[p]redominance requires a further inquiry .... into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Id.* Rule 23(b)'s predominance requirement is more difficult to satisfy than Rule 23(a)'s commonality requirement. *Comcast*, 569 U.S. at 34 ("Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)").

To meet this requirement, "the common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal citations and quotation marks omitted), *abrogated on other grounds by Baker*, 137 S. Ct. 1702. "Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Amgen Inc.*, 568 U.S. at 470).

In *Roach*, 778 F.3d at 405, the Second Circuit recently affirmed its prior holdings that, though relevant, "'the fact that damages may have to be ascertained on an individual basis is not

sufficient to defeat class certification' under Rule 23(b)(3)." *Id.* (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)).

The Plaintiff asserts that the proposed class satisfies the predominance requirement because (1) liability turns on the objective analysis of the Defendants' standard contracts; (2) any putative defenses regarding the Defendants' arbitration provision are equally suited to class-wide adjudication; and (3) injury and damages can be determined class-wide. The Defendants counter that (1) Jensen has failed to prove class-wide injury; (2) Jensen has failed to prove class-wide causation; and (3) unique defenses to absent class members will predominate.

The Plaintiff contends that common proof will prove that all class members were injured by increased electrical costs and injuries to their privacy. At the class certification stage, the Supreme Court instructs that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407; *Comcast*, 569 U.S. at 35 ("a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"). "Calculations need not be exact … but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast*, 569 U.S. at 35 (internal citations omitted). Although a plaintiff "does not need to 'implement' or 'test' his methodology at the class certification stage, he must still provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *9 (S.D.N.Y. Aug. 5, 2010).

To demonstrate an injury under § 349, the Plaintiff must put forth evidence that the Defendants "engaged in an act or practice that is deceptive or misleading in a material way and that [the Plaintiff has] been injured by reason thereof." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55-56, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999) (internal citations and quotation marks omitted); GBL § 349 ("[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name … to recover his actual damages or fifty dollars, whichever is greater[.]").

In the instant action, the Plaintiff has not presented proof on behalf of absent class members of injury pursuant to § 349. Jensen presents two theories of class-wide injury: (1) increased electrical costs; and (2) intrusion into privacy and autonomy.

The invasion of privacy theory rests on the opinions of Dr. Golbeck, a Professor of Information Studies at the University of Maryland. For the reasons discussed *supra*, in Section II.C.2, paragraphs 30 to 57 have been stricken from Dr. Golbeck's expert report and will not be used in the disposition of the instant motion for class certification. In the remaining sections of her report, she proffers that, in relevant part:

> consumers have expectations of privacy and autonomy, with regard to their home routers; and … Cablevision's practices with regard to broadcasting Optimum Wifi public hotspots from its customers' home routers—including Cablevision's representations to customers about both the home routers and the Optimum Wifi hotspots—undermine customers' expectations of privacy and autonomy.

Expert Report of Dr. Jennifer Golbeck ¶ 15. This is not a cognizable injury under § 349, which requires actual injury or damages. *See Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). While Cablevision's practices may have violated certain consumers' expectations of privacy and autonomy, as Dr. Golbeck notes in her expert report, the Plaintiff has failed to put forth any evidence that any damage resulted from violating customer expectations. Even if Jensen

did assert an invasion of privacy claim, *i.e.* the unauthorized collection of data, "§ 349 injury has been recognized only where confidential, individually identifiable information—such as medical records or a Social Security number—is collected without the individual's knowledge or consent." *Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 35 (2d Cir. 2017) (collecting cases).

The Plaintiff contends that allegations of "anxiety or distress" from privacy incursions is sufficient to constitute an actual injury under § 349. In support, Jensen cites the district court's decision in *Mount v. PulsePoint, Inc.*, No. 13 Civ. 6592, 2016 WL 5080131, at *12 (S.D.N.Y. Aug. 17, 2016), which, according to the Plaintiff, "noted that there *was* precedent for privacy claims alleging 'anxiety or distress.'" Plaintiff's Reply Brief at 8. However, in the precedent noted by the district court, *Meyerson v. Prime Realty Servs., LLC*, 7 Misc. 3d 911, 912, 796 N.Y.S.2d 848 (Sup. Ct. 2005), the state trial court required the plaintiff to disclose her Social Security number or face eviction. Concluding that the "weight of authority favors treating a social security number as private and confidential information," *Id*. at 917, and in deciding a motion to dismiss, found that an allegation of anxiety and distress was sufficient. *Id*. Therefore, the *Mount* trial court's reference to anxiety or distress is properly regarded as dicta.

Further, the Plaintiff has failed to contend that *any* private or personal information was ever collected by Cablevision or accessed by a Cablevision user via the Optimum Public Wi-Fi network. "Courts have held … that the release of potentially sensitive information alone, without evidence of misuse, is insufficient to cause damage to a plaintiff." *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 608-09 (S.D.N.Y. 2009) (collecting cases). As Dr. Golbeck testified during her deposition, there is no evidence of any instance in which a subscriber's personal data was accessed using the Optimum Public Wi-Fi network. *See* Ingber Decl., Ex. 14 at 70:4-71:22. In today's modern technological landscape, privacy protection is at the forefront of the consumer consciousness.

47

Navigating the plethora of new technologies that collect a myriad of private data can seem like a potential minefield to consumers and induce a fair amount of anxiety. Yet, the subjective privacy expectations of consumers, while important data points for companies like Cablevision, are not actual injuries under § 349. To hold otherwise would be inconsistent with state and federal jurisprudence and vastly expand the scope of the statute. The *potential* for the release of private information, without any evidence of the *actual* release of private information, by itself, does not constitute an injury sufficient to state a claim under § 349.

Accordingly, the Plaintiff's privacy theory is insufficient as a matter of law to demonstrate class-wide injury.

The Plaintiff's second damages theory, that the Optimum Public Wi-Fi network causes increased electricity costs, relies primarily on the expert testimony of Dr. Mitchell Smooke, the Strathcona Professor of Mechanical Engineering at Yale University. For the reasons discussed *supra*, in Section II.B.2, Dr. Smooke's expert report will not be used in the disposition of the instant motion for class certification.

Without the expert report of Dr. Smooke, the Plaintiff relies exclusively on Cablevision's internal study on the power consumption of three wireless routers to prove that damages can be proved on a class-wide basis. *See* Class Cert. Wade Decl., Ex. 8. This study was conducted on three wirless routers—D-Link 868L, Netgear 3400 and Sagemcom 3965. For each router, Cablevision employees tested the power consumption when (1) idle; (2) connected to the Optimum Residential Wi-Fi network only; (3) connected to the Optimum Public Wi-Fi network only; and (4) connected to both the Optimum Residential Wi-Fi network and the Optimum Public Wi-Fi network. This consisted of one-hour continuous file transfers, for a total of 25 tests, with half performed on the 2.4 Ghz band and the other on 5 Ghz band. For the Sagemcom 3965, the monthly

electricity cost of actively using both networks was 10 cents higher than the cost of only using the Optimum Residential Wi-Fi network on the 2.4 Ghz band and 15 cents higher on the 5 Ghz band. When testing the Netgear 3400, the monthly electricity cost of actively using both networks was seven cents higher than the cost of only using the Optimum Residential Wi-Fi network on the 2.4 Ghz band and one cent higher on the 5 Ghz band. The tests that involved the D-Link 868L resulted in an increased average monthly cost of 29 and 31 cents when using the 2.4Ghz and decreased by one cent when using the 5 Ghz band.

This study does not provide reliable evidence that the proposed class suffered damages that can be proven on a class-wide basis. Only two of the three routers showed any increase in electrical consumption on both the 2.4 Ghz and 5 Ghz bands. For the D-Link 868L, the test actually revealed a *decrease* in electrical consumption. In the remaining two wireless routers, the increase in cost was diminimis. Without nearly enough data to report averages, standard errors, or margins of errors, the Court is unable to draw any conclusions from these results. These tests were not repeated and only intended to provide a range of monthly power consumption. In the outcome section, the study notes that, "[d]ue to dynamics of environment, [and] location results can vary." *Id*. For those tests that did show an increase in power consumption, this increase very well may have been within a proper study's margin of error.

Even if the Court assumes that data can conclusively be derived from this study, it only confirms that increased electrical costs cannot be demonstrated on a class-wide basis. Cablevision provides one of four models of wireless routers: Sagemcom 5260, Sagemcom 3965, D-Link DIR-868L and Netgear 3400. The Sagemcom 5260 is not represented in this study *at all*. Therefore, the Court cannot draw any conclusions regarding purported class members that were provided with a Sagemcom 5260. Without any information in the record regarding the number of absent class

49

members that used this router during the class period, no information is available for at least a plurality of the proposed class. Further, the D-Link 868L showed a decrease in monthly costs using the 5 Ghz band and an increase using the 2.4 Ghz band. This does not demonstrate that customers using this router experienced an increase in costs over the class period. And once again, without information on the frequency of this router among the proposed class, the Court is unable to determine how many individuals are impacted.

Finally, the Defendants' expert, Dr. Terrence McGarty conducted his own laboratory test of power consumption and confirmed that both the Sagemcom 5260 and the D-Link 868L experience a decrease in incremental average power usage when streaming video data. These results only muddle the waters. Without additional data regarding the proportions of the class that used each of the four wireless routers and a scientifically acceptable study that shows an increase in electricity consumption, this Court cannot conclude that either Jensen or members of the purported class were injured in this manner.

Accordingly, the Plaintiff has not demonstrated that increased electrical consumption can be demonstrated on a class-wide basis.

Finally, assuming *arguendo* that the Plaintiff was able to demonstrate that either increased electrical consumption or intrusion into privacy or autonomy could be demonstrated on a class-wide basis, individual issues predominate this action because a share of Cablevision's New York Wi-Fi subscribers may have wanted the free wireless router that was Optimum Public Wi-Fi enabled. In *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 74 (S.D.N.Y. 2013), the court denied certification of a proposed New York class of consumers alleging violations of § 349. There, the plaintiffs claimed that XM's automatic renewal policy constituted a deceptive trade practice. Judge Owen held that the proposed New York class lacked predominance because those

customers that wanted to have the service automatically renewed did not suffer a cognizable § 349 injury, regardless of the sufficiency of the disclosures. "Ascertaining which customers actually wanted renewal requires a myriad of individual inquiries that would predominate over any common questions." *Id*.

*Brissenden v. Time Warner Cable of New York City*, 25 Misc. 3d 1084, 886 N.Y.S.2d 879 (Sup. Ct. 2009) is also illustrative. There, the plaintiff filed a putative class action lawsuit alleging that Time Warner inadequately disclosed that customers were not required to rent cable boxes or remote controllers, in violation of § 349. *Id*. at 882-83. The court denied the Plaintiff's motion for class certification motion, noting that there was no injury to customers who wanted the equipment and that an individual inquiry was required to determine which customers were injured. *Id*. at 884-85.

In the instant case, there is undoubtedly an economic benefit that customers receive by being provided with a free wireless router. Further, the installation of a Wi-Fi network that is accessible to customers outside of their home provides a significant benefit to Cablevision customers. For customers who wanted the router either regardless of or because of the Optimum Public Wi-Fi network, there was no cognizable § 349 injury. To ascertain which New York customers' individual preferences requires individual inquiries would predominate over common questions.

Accordingly, the Court finds that the Plaintiff has not satisfied Rule 23(b)(3)'s predominance requirement.

## 2. Superiority

"Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S.*

*Foodservice Inc. Pricing Litig.*, 729 F.3d at 130; *see also In re Sinus Buster Prod. Consumer Litig.*, No. 12–CV–2429, 2014 WL 5819921, at *6 (E.D.N.Y. Nov. 10, 2014) (Spatt, J.) ("Class treatment is often deemed superior in negative value cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually." (quoting *In re Advanced Battery Tech., Inc. Sec. Litig.*, 298 F.R.D. 171, 182 (S.D.N.Y. 2014))); *Whitehorn*, 275 F.R.D. at 200 ("Courts routinely hold that a class action is superior where, as here, potential class members are aggrieved by the same policy, the damages suffered are small in relation to the expense and burden of individual litigation, and many potential class members are currently employed by Defendant.").

Here, the Plaintiff asserts that a class action is superior to other potential methods of adjudicating the putative class members' claims because § 349(h)'s $50 statutory damages cap precludes individual absent class members from pursuing their claims individually. *See, e.g.*, *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 340 (E.D.N.Y. 2013) (Spatt, J.). The Defendants fail to address superiority in their opposition briefing.

The Court finds that this case is precisely the type of "negative value" case for which the class action mechanism was designed. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246, 138 L. Ed. 2d 689 (1997) ("'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997))).

Accordingly, the Court finds that the Plaintiff has satisfied Rule 23(b)(3)'s superiority requirement.

However, the failure to satisfy Rule 23(b)(3)'s predominance requirement precludes class certification under Rule 23(b)(3).

## D. RULE 23(B)(2)

In the alternative, the Plaintiff seeks class certification of an injunctive class under Rule 23(b)(2). The rule allows for class treatment where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). A Rule 23(b)(2) class is typically certified when "class-wide injunctive or declaratory relief is necessary to redress group injuries, such as infringements on civil rights, and is commonly relied on by litigants seeking institutional reform through injunctive relief." *Manual for Complex Litigation* § 21.142 (4th ed. 2004).

As the Court has already determined that the Plaintiff failed to satisfy Rule 23(a)'s requirements, the Court is unable to certify a Rule 23(b)(2) injunctive class.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion to exclude the report and testimony of Dr. Mitchell Smooke is granted in part and denied in part and the Defendants' motion to exclude the report and testimony of Dr. Jennifer Golbeck is granted in part and denied in part.

The Plaintiff's motion for class certification pursuant to Rule 23 is denied.

It is **SO ORDERED**:

Dated: Central Islip, New York

February 27, 2019

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge